May it please the Court, since I wasn't District Court Counsel, I also am not 100% positive how to pronounce my client's name, but we're going to go this morning with Gail Ivins on behalf of Mr. Taquan Gullett, which is how he's referred to in the District Court record. Okay, thank you. Your Honors, I wanted to start this morning with the question of standard of review. What standard of review should this Court apply when reviewing a revocation of pro se status? The government has argued, obviously, plain error. I think, though, that if we look at the other FRERDA cases, it's clear that it's de novo. We have the approach taken in Fluitt, which suggests de novo. They don't come out and say that they're doing a de novo review, but they conduct a review that appears to be de novo. We also have the U.S. v. Arlt case, which has someone who's, you know, pro se status. He asked to be pro se. He requested self-representation. Judge Raffidi denied that. He then later asked to substitute in a retained lawyer. The government said, well, ask him if he's now waiving his right. And Judge Raffidi said, no, I'm not going to do that. And this Court said that was, you know, it was not waived, that that was sufficient, and reviewed it de novo. So I think that the related authorities all suggest that this Court's review of the question presented in this appeal on the FRERDA issue is de novo. As a practical matter, what impact does the standard of review have on the outcome of this case? Well, that's a good question, since it is structural error to deny someone their FRERDA rights. Arguably, we would meet the plain error standard. Well, if you're arguing structural error, that doesn't make any difference what the standard of review is, right? I think that's right, Your Honor. Are you arguing that this is structural error? It is structural error to deny someone their FRERDA rights, yes. Well, whether it was denied or not has to be judged by one of the two standards of review. Yes, Your Honor. So let's put structural error to one side and go back to what you were discussing just a moment ago. The error part, right? I mean, plain error has four parts. I mean, the error part is the structural error. First, we have to have that there was an error. Right. I mean, which I would go back to, but I can also continue discussing why this is de novo review or what the error is. You know, he had pro se status, so he was granted that pro se status, and the court very clearly in both her stated remarks at the hearing, I guess more so than in her written order, talked a lot about how, you know, he wasn't ready. I mean, I will admit FRERDA is a minefield for district court judges. I get that. But that doesn't mean we don't have to be careful and review the cases carefully. And in this case, she never – I mean, in her written order, what she says is that he seemed amenable and didn't object, which is why there's so much focus, I think, in the appeal on whether we need an objection, which is why we get to the plain error question. Okay. When you talk about him not being ready, he was originally asking for an adjournment, and he had had adjournments before. And so when he indicated that he wanted more time and that was denied, didn't he say at that point that he wasn't ready to proceed and he was prepared to go forward? So looking at the record, what happens is first Mr. Cohen, the standby counsel, speaks and tells the judge he's going to give her a preview that, you know, he's not ready and that if the court's not inclined to grant a continuance, obviously Mr. Cohen knew that the court was not going to be inclined to grant a continuance, trial was set to start, and that if that were the case, that Mr. Gullett was going to ask to have him represent him. It seemed pretty hopeless that he was going to be able to get to the level of competent representation, which is why I think counsel stepped in. And I think that why all this happened is 100% clear, and had Judge Snyder said to Mr. Gullett, you're, you know, standby counsel says that if I deny your request for continuance, which I am going to do, and it's denied. Now I need to know what you want to do about the fact that you currently are representing yourself. I appointed standby counsel, which I'm allowed to do under Feretta. Feretta says, and McCaskill, we get to appoint, the court gets to protect its own interests by appointing standby counsel who will be ready to step in. I did that, so I have Mr. Cohen here ready to step in. You're currently representing yourself. What do you want to do, Mr. Gullett? But didn't he say that he wasn't ready to proceed to trial today, and he said that there's a lot of procedure, a lot of rules. I have not yet absorbed those points. I can't even begin to grasp, it seems like, the rules. And he ultimately said, I'm definitely overwhelmed at this point, and although three months is some time for myself, I need an additional three months. And so it was either go now or I'll take another lawyer, or I'll let my lawyer represent me. I mean, that is clearly inference, Your Honor, but he doesn't say that. He's still arguing for why he needs the three-month continuance. Right, right. And the court denied that, and that was clear, and we obviously didn't challenge that on appeal, the denial of the request for continuance, because the district court judge was 100 percent within her rights at that point to deny the continuance. You don't dispute that he had a number of other continuances in the case, do you? No, I don't dispute that it would have been appropriate for the judge to deny the continuance and to put him to his choice, because his ability to represent himself, his preparedness, his compliance with the rule are all specifically not appropriate factors to consider in denying someone their FRERTA rights. He's allowed to make a total mess of it. I mean, I understand why judges don't prefer FRERTA. I understand why it's been cut back in Martinez and in Indiana v. Edwards. It makes perfect sense. We had three Supreme Court justices who dissented in FRERTA for very good reasons, but it's the law, the binding law of the Supreme Court, and his inability to represent himself was not the question before the court, even though she seemed to treat it as it was. The question was, after she denied his continuance, what did he want to do? Couldn't he have said, I know I want to represent myself? He could have said that, Your Honor. Was he given the opportunity to speak? I don't think he was given the opportunity. She didn't ask him, did he have anything to say? She said, I'll hear from the government. She said, okay, Mr. Gullett. Mr. Gullett said, like Mr. Cowan stated, I'm really not ready to proceed with trial today. Yes, he could have said something then, but what he addressed was his continuance request. So you think we should send this whole thing back because the judge didn't say explicitly, do you want to continue to represent yourself? Because the judge relied in her order on his lack of an objection to what she said and that he appeared amenable rather than that he said, okay, then I want the lawyer to step back in. Or alternatively, courts do have the power to terminate pro se status. This just isn't a record that supports that. If he'd been acting out or threatening people or misbehaving or throwing things, I mean, there are many cases and there's one pending in the Supreme Court right now, May v. Crothers, I think, which is exploring the parameters of when can you revoke someone's pro se status when they don't want it revoked. But doesn't the whole record reflect that he acquiesced and consented and concurred in what his lawyer said about him not proceeding pro se but being represented? I mean, that is certainly one way to view the record. I mean, she says amenable to in her written order, and that is certainly a way to view the record. I mean, I think with a strict interpretation of Feretta and its progeny, you know, he was never asked. He didn't waive his Feretta rights. He was proceeding pro se, and based on a statement by advisory counsel, he was not heard, and his Feretta rights were terminated. But he could have been heard. He could have spoken up. He could have spoken up, Your Honor. Don't we have some cases that say that silence implies consent? Isn't McCaskill on that point? Absolutely, Your Honor, and I think I distinguished that in the reply brief. It very specifically has to do with the standby counsel, like, appearing at sidebar counsel issues. It does not have to do with 100 percent denial of the right to self-representation. So it says basically once you and your standby counsel are doing that thing that often happens in these cases where you're in over your head and so you don't know how to discuss the jury instructions and you don't know how to make objections and preemptory challenges and you start letting your standby counsel do some of it, the case law says now you can't be heard to complain that you let your standby counsel, you know, go to a sidebar conference where you previously had said it was okay or make preemptory challenges when you said it was okay. That is not this case, and I see that my time is up. All right. Thank you very much, counsel. Thank you. May it please the Court, Nancy Spiegel for the United States. Here it's clear that the defendant not only acquiesced in having standby counsel represent him, but that was his choice. That was his preference. The Court, this was the morning of trial. But tell me how it's absolutely clear. Point to something in the record that shows it's absolutely clear. Well, of course the defendant didn't, you know, come out and explicitly say, I want standby counsel to represent me, but through standby counsel, and standby counsel said the defendant requested that I address the Court and state that if the Court doesn't grant a continuance, he wants me to represent him. That was pretty clear, and the defendant was standing right there and the defendant then had the opportunity to and did address the Court. There's no claim here that he needed a translator. No, Your Honor. And he did address the Court and he did speak to the Court and he spoke about the continuance and he reiterated what standby counsel said, which was, I'm not ready. I am not ready to proceed. That's why I need this three-month continuance. And I think it was understood in the context of what was happening and what had just transpired between standby counsel and defendant looking at their statements together, that the District Court understood that. But you agree it would have been better, because what standby counsel said is, and I think his view is, that if we are going to proceed today, he'd prefer me to represent him. And don't you think it would have been better and clearer if the Court confirmed with Gullah that that was, in fact, his view? Of course it would have been better. I mean, we wouldn't be here if that had happened. But I don't think it was absolutely necessary under these circumstances because the defendant, you know, listening to what standby counsel said and the defendant right one second later could have said, oh, he's mistaken, I don't want him to represent me, that's not what I mean at all. And he didn't say that. And, you know, furthermore, when the Court, at some point, talking about the continuance, and standby counsel had to ask the Court, are you revoking his pro se status? And the Court said yes. Again, defendant was standing right there and could have said, oh, please don't do that, that's not what I intended, that's not what I meant. And that's not what happened. But under FRERETA, I mean, I hate to be so technical, but under FRERETA it's not the defendant's obligation to say that, it's the Court's obligation to make the inquiry. Well, that's clear when it's at the initial, you know, reading of the admonishments and the warnings. Why would it be different at a revocation? Because I think here it doesn't have to be so unequivocal as it has to be when you're waiving the right originally. Do you have a case for that? I don't, but McCaskill seems to support this position in that McCaskill does say that a defendant's lack of objection or acquiescence in standby counsel's statement, you know, can be taken at face value. And I think that's what happened here. Do you think which standard of review we apply makes a difference in this case? I don't. I don't think it will make a difference ultimately. I think, you know, plain error does apply here, and the reason why I think it does is because, unlike the cases cited by the defense, which were, again, cases where especially Erskine discourse case, where that was a case where the court was initially giving the defendant his admonishments before agreeing to let him go pro se. And the court said, look, he doesn't know what all his rights are, and he has no basis to form an objection. We can't hold him to that. Here we have the opposite situation where, again, the defendant is standing there, has an opportunity to address the court, does address the court, and does not object. You know, when he originally was given pro se status, were those rights covered with him at that point? Yes, they were, Your Honor, and there's no claim that they weren't. No, but I'm just trying to remember that that's what happened. Yes, he was fully admonished and advised. Do you want to address the sentencing enhancement issue? Certainly. Our position with the sentencing enhancement issue is that it can be affirmed on two different grounds. First ground, which was not raised below but we did raise in our brief, was that the court can just look at the counts of conviction, counts three and four, and see that those were two separate debtors, one debtor in each count. And the encumbrance that was filed on December 2010 in California actually imposed four separate liens. There were four separate debtors. And the purpose of the enhancement is to say basically that if you're victimizing more than two people, then you should be punished more severely. And so that encumbrance actually affected four separate debtors and four separate sets of property. And so we would argue the enhancement would apply on that ground. But even if not, the two additional liens that were filed would support the enhancement. The second lien that was filed in December of 2010, it was filed on the same day as the lien of conviction. It referenced the same exact monetary amount, which was $20.5 million, and two of the same debtors. And it was a few hours after the first filing that was charged in the indictment, but we're talking about relevant conduct here. And the enhancement speaks to the offense. The offense covers relevant conduct. So I think that second December lien certainly is covered under the enhancement. And finally, even the January 2012 filing is covered because that filing dealt with not the 2009 tax return, but defendant's 2010 tax returns. And it wasn't until December of 2011 that the IRS assessed the frivolous penalty to defendant. And this lien was in retaliation for that assessment, and it was filed the very next month. So I think timing-wise, it does fall within relevant conduct. What did you think about the appellant's argument that that 2012 filing was quite a bit after the conduct charged in the indictment? Because there's a note that says that relevant conduct only deals with something prior to or during the conduct. And there's clearly here a window between the 2010 filings and the 2012 filings. What's your response to that? That's true, Your Honor. But again, offense conduct does include all relevant conduct as defined in the guidelines. So the defendant filed his 2010 false tax return. The penalties weren't assessed until December of 2011. And so the fact that the lien was filed in January 2012, if you look at it in that perspective, is not so far outside the realm of the offense conduct that it wouldn't be included in relevant conduct. If the Court has no further questions, Government will submit. Okay. Thank you. Do you want rebuttal? Okay. Just on the sentencing issue, Your Honor, thank you. I only found five cases on Westlaw that interpret this statute, so it's not like we have a lot of law to help us. But I do think that it is possible that we should not consider relevant conduct in this situation because 1B1.1i says that relevant conduct means what the AUSA says it means, unless a different meaning is specified or is otherwise clear from the context. And that note that Judge Drain mentioned discusses scope of conduct to be considered in a very specific term, which says, you know, during the offense or prior to. So I would argue it's not relevant conduct because of that definition. Well, what about the ones and counts three? I understand the Government changed its position from trial to appeal. But what about the counts three and four in the very indictment? I mean, the Government makes a good point, but I would say that Neal, which is one of the cases that does interpret the statute, talks about the purpose for the two different enhancement multiple counts and then this enhancement and says the purpose for when it's more than two liens is the additional difficulty in removing more liens, which suggests that liens are something you would, you know, be able to sue to remove, and each of those is one in that sense. Even though there are multiple victims, multiple IRS entities named, they are one in the sense that they file a lawsuit to remove it. One lien as opposed to one victim. That's what you're arguing? Yeah. All right. Thank you. All right. Thank you. U.S. v. Galatek and Rush is submitted, and we will take up U.S. v. Hernandez-Vasquez.
judges: Wardlaw, Bea, Drain